IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANIEL J. CSASZAR,** | : | CIVIL ACTION |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| **MONARCH MEDICAL, LLC, d/b/a** | : | |
| **AFC URGENT CARE et al.,** | : | |
| | : | |
| *Defendants*. | : | NO. 23-cv-1286 |

**<u>MEMORANDUM</u>**

**KENNEY, J.**                                                                                                                                **MARCH 26, 2024**

This action arises from a series of claims resulting from Plaintiff Dr. Daniel J. Csaszar's firing by his employer, Defendant Monarch Medical, LLC ("Monarch"). Monarch moved for summary judgment, which was denied on all counts. Monarch had submitted an expert report that addressed Plaintiff's mitigation of damages following his termination. Plaintiff moved to strike that report under *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702; this motion is presently before the Court.

**I.    BACKGROUND**

Dr. Csaszar is a physician who worked at an urgent care facility run by Monarch beginning in 2015, working one shift per week. In 2019, he moved to two shifts per week. Following a dispute with his supervisor that is the subject of this litigation, Dr. Csaszar was ultimately terminated on March 9, 2022. Dr. Csaszar then began to apply to other jobs, and ultimately secured a job at LVPG Palmerton Family Medicine (part of Lehigh Valley Health Network) which he began on October 17, 2022.

Defendants submitted the report in furtherance of their theory that Dr. Csaszar failed to mitigate his damages by timely seeking another job. The report lists eight jobs that Dr. Csaszar "made contact regarding" between March 15, 2022 and October 17, 2022. ECF No. 26, Ex. A ("Staller Report") at 2. The report then seeks to "survey the potential employment market available to Dr. Csaszar from the time of his separation to the present." *Id.* at 3. To do so, the report uses data from Forensic JobStats, which pulls listings from the Gartner TalentNeuron database. *Id.* at 4 & n.10. The report pulled all job listings that fell into the following categories: Emergency Medicine Physicians, Family Medicine Physicians, General Internal Medicine Physicians, and "Physicians, All Other." *Id.* at 4. The report then filtered in listings that contained the title keywords "D.O.", "Family", "Primary", "Sports", "Urgent" and that were based in the Philadelphia metropolitan area. *Id.* Listings that referenced academic positions, fellowships, residencies, and other specialties were removed. *Id.* The report indicated that after applying these filters, there were 482 listings available between March 15, 2022 and October 17, 2022 (when Dr. Csaszar began working at Lehigh Valley), and 1,102 listings available between March 15, 2022 and December 22, 2023 (the date of the report). The report draws two conclusions: that "Dr. Csaszar made a total of eight job search efforts between March 15, 2022 and October 17, 2022…or 0.27 efforts per week," and that "additional employment opportunities for Dr. Csaszar existed and continue to exist." *Id.* at 4.

Following the submission of the report, Defendants deposed Dr. Csaszar, who also produced additional discovery regarding his job applications. In his deposition, Dr. Csaszar stated that he began applying for other jobs on March 3rd, 2022 and received 12-15 interviews. ECF No. 27, Ex. A ("Csaszar Dep.") 171:19-173:13. He stated that he received three offers. *Id.* at 173:14-174:25. During the discussion, Dr. Csaszar names six specific employers that were not listed in

the report: St. Luke's, Jackson Coker, Weatherby, Penn State, Penn Medicine Lancaster, and Einstein. *Id.* at 171:25-176:4. Defendants note that the deposition and supplemental production occurred after publication of the report and seek leave to supplement the report to include that information, but do not state a view on the details of those additional applications. ECF No. 30 at 11.

II. **STANDARD OF REVIEW**

Federal Rule of Evidence ("FRE") 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

This Rule places district courts in the role of the "gatekeeper," requiring courts to ensure that the expert testimony is both (1) relevant and (2) reliable. *See David v. Black & Decker (US) Inc.*, 629 F. Supp. 2d 511, 514 (W.D. Pa. 2009) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). In the *Daubert* context, "relevance has been described as one of 'fit' or 'helpfulness'"; that is, the expert's testimony must help "the trier of fact to understand the evidence or to determine a fact in issue." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 n.12 (3d Cir. 2000) (citing *Daubert*, 509 U.S. at 591–92). To determine whether an expert's conclusions are reliable, "a district court must . . . determine whether [the conclusions] could reliably follow from the facts known to the expert and the

3

methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). Fundamentally, an expert must have "good grounds" for his opinions. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 732 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 590).

Rule 702 was recently amended to emphasize that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." *Allen v. Foxway Transp., Inc.*, 2024 WL 388133, at *3 (M.D. Pa. Feb. 1, 2024). This amendment was motivated by the Advisory Committee's "observation that in 'a number of federal cases ... judges did not apply the preponderance standard of admissibility to Rule 702's requirements of sufficiency of basis and reliable application of principles and methods, instead holding that such issues were ones of weight for the jury." *Id.*

An employer bears the burden of demonstrating that a plaintiff failed to mitigate his damages by showing that "1) substantially equivalent work was available, and 2) the [] claimant did not exercise reasonable diligence to obtain the employment." *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 864 (3d Cir. 1995). *See also Socoloski v. Sears Holding Corp.*, 2012 WL 3155523, at *7 (E.D. Pa. Aug. 3, 2012) (quoting *Tubari, Ltd. v. NLRB*, 959 F.2d 451, 454 (3d Cir. 1992) ("A plaintiff who brings claims for front pay and back pay under the…ADA has a duty to mitigate his damages by exercising reasonable diligence in his efforts to secure employment." (cleaned up)).

III.   DISCUSSION

   a.  The Report Does Not Assist the Trier of Fact

The report suffers from two fatal flaws that deem it inadmissible under FRE 702. First, the report will not aid the trier of fact in determining a fact in issue. The relevant facts in issue are whether substantially equivalent work was available, and whether Dr. Csaszar exercised

4

reasonable diligence in obtaining other employment. Defendants do not dispute that Dr. Csaszar began working at Lehigh Valley on October 17, 2022 (at a job which he applied to on June 30, 2022), so the expert's task is to help the jury determine whether Dr. Csaszar's job search was reasonably diligent. Instead, the report merely proffers the number of jobs that Dr. Csaszar applied to,[1] and states that "additional employment opportunities…existed and continue to exist." Staller Report at 4.

Defendants repeatedly point out that they are not advancing the claim that Dr. Csaszar failed to conduct a reasonable search, or provide a span of time in which he should have found a job. ECF No. 30 at 4, 7-8. To be sure, such opinions have routinely been deemed inadmissible. *See, e.g.*, *Petrulio v. Teleflex Inc.*, 2014 WL 5697309, at *15-*16 (E.D. Pa. Nov. 5, 2014). A useful expert opinion on this topic would provide information that is "outside the knowledge of a layperson" and bears on topics such as "the nature and degree of efforts which typify an average or successful job search and how plaintiff's efforts compare to what are typical – or successful – efforts." *Id.* at *15 (cleaned up and citations omitted); *see also Joffe v. King & Spalding LLP*, 2019 WL 4673554, at *10 (S.D.N.Y. Sept. 24, 2019) (a vocational expert may "testify as to what a reasonable job search, in her experience, typically consists of, and how Plaintiff's job-search efforts compare" (citations omitted)). Telling the jury that additional job opportunities existed will simply not provide them with the information they need to conclude that Dr. Csaszar did or did not appropriately mitigate his damages. Moreover, per Dr. Csaszar's deposition testimony, Plaintiff *agrees* that "additional employment opportunities . . . existed" beyond the eight jobs listed in Mr. Staller's report, since he alleged that he applied to many more jobs than just those eight. Accordingly, this conclusion does not bear on a fact in issue. Nor does relaying the number of job

---

[1] A number which is almost certainly incorrect, as discussed *infra*.

search efforts made help the jury determine whether that number of efforts is reasonable. Indeed, calculating eight job applications over 30 weeks to equal 0.27 job applications per week is an equation easily doable by the jury that does not require expert testimony. Mr. Staller may seek to forestall these critiques by claiming that his expert analysis resulted in aggregating 1,102 job opportunities that were available to Dr. Csaszar, but this merely leads to the second flaw: the lack of a reliable methodology underlying that analysis.

### b. The Report Lacks a Reliable Methodology

Mr. Staller provides no methodology for assessing Dr. Csaszar's employment background in order to determine which jobs were appropriate for him. A vocational expert opinion would be helpful if it assessed whether Dr. Csaszar's "background and experience made him qualified for those available positions." *See Mooney v. Roller Bearing Co. of Am., Inc.*, 601 F. Supp. 3d 881, 887 (W.D. Wash. 2022). Here, Dr. Csaszar testified that he was "board certified in family medicine and primary care sports medicine," and that he "wouldn't apply for an internal medicine job or an emergency medicine position" or other specialty positions. Csaszar Dep. at 223:2-21.[2] Nevertheless, Mr. Staller's report includes one listing for an emergency medicine position, 42 listings for internal medicine physicians, as well as 21 listings in a catch-all category of "all other" physician positions. *See* Staller Report at 3.[3] Many of the entries for family medicine are overly broad, and Mr. Staller has not provided any rationale or methodology for determining which listings were an appropriate fit for Dr. Csaszar.

---

[2] As discussed *infra*, Dr. Csaszar's deposition occurred after publication of the expert report. However, Defendants did not evince any intent to supplement their report based on their information until filing their opposition brief on March 8, 2024.

[3] The number of listings for each specialty was determined by searching for those specialties using the codes identified on page 3 of the Staller Report.

Defendants contend that Mr. Staller produced a similar report that was approved in *Kochka v. West Penn Allegheny Health Sys. Inc.*, 2023 WL 7525378 (W.D. Pa. Nov. 14, 2023). In that report however, Mr. Staller analyzed the plaintiff's employment file and deposition testimony to determine which job listings would be appropriate for the plaintiff in that particular case. *See* ECF No. 30, Ex. 2 at 6. By contrast, Mr. Staller did not identify *any* specific documents that he reviewed to determine which jobs would be appropriate for Dr. Csaszar; the only items he reports having reviewed in the relevant section were the employment listings, but nothing that would shed light on Dr. Csaszar's background. Staller Report at 3.

Aside from the substance of the job listings, the parties dispute whether Dr. Csaszar could legitimately have applied to job opportunities outside of Pennsylvania. Dr. Csaszar argues that he is only licensed in Pennsylvania, and so would not be able to work in any other state, including those like New Jersey or Delaware that are within commuting distance of Pennsylvania. Defendants point out that Dr. Csaszar had applied to locations in North Carolina, Florida, and Hawaii, arguing that Dr. Csaszar has opened the door to considering a broader geographic range of employment. Again, this is an issue that Mr. Staller should have considered at the outset. It is possible that some states have licensing reciprocity agreements with Pennsylvania, or low barriers to entry for licensing of experienced providers.[4] Had Mr. Staller performed a geographic analysis specific to Dr. Csaszar's personal licensure status, he would have developed a grounded, fact-based methodology for determining appropriate places of employment for Dr. Csaszar. Instead, he did not employ any methodology for considering Dr. Csaszar's employment record, or the locations that would be appropriate for him to apply to. Plaintiff should not be required to cross-

---

[4] Indeed, in one of Defendants' exhibits, a consultant at Weatherby tells Dr. Csaszar that "[f]acilities in Hawaii [are] accepting out of state [p]hysicians." ECF No. 30, Ex. 3 at 31.

examine Mr. Staller on the specifics of over 1,000 job applications; inappropriate applications should have been screened out in the first instance.

Mr. Staller seeks to sidestep these holes in his methodology by refraining from drawing the conclusion that Dr. Csaszar had 1,102 jobs to apply to, instead retreating to the vaguer assertion that "employment opportunities existed and continued to exist." Staller Report at 4. Unfortunately, that conclusion is of no use to the jury since it has no bearing on the reasonableness of Dr. Csaszar's job search. As such, Defendants have not demonstrated "that it is more likely than not that…the testimony is the product of reliable principles and methods." FRE 702.

### c. Defendants' Alternative Request to Supplement the Report is Denied

Defendants seek, in the alternative, to supplement their report to include the information raised in Dr. Csaszar's deposition and document production pertaining to additional job applications that post-dated the initial report. This supplement would be both untimely and futile.

Federal Rule of Civil Procedure 26(e)(1)(A) requires an expert to supplement his report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." This rule has been used to permit supplementation "when an expert receives newly produced information after submitting his or her expert report." *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 2019 WL 581544, at *3 (D.N.J. Feb. 13, 2019). Mr. Staller's expert report was submitted at the deadline to exchange expert reports, on December 22, 2023. Dr. Csaszar's deposition – at which the new information was first revealed – took place on January 8, 2024.[5] Even as they learned of this new information and received a production of documents pertaining to it, Defendants did not file a

---

[5] The fact discovery deadline had been extended to January 26, 2024 by agreement of the parties.

supplemental expert report, nor a motion for leave to do so, even up to the deadline for dispositive motions over a month later, on February 16, 2024. Instead, Defendants requested to supplement in the alternative, with a few sentences at the end of their opposition brief, making it appear "more like tit-for-tat than a serious request." *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *34 (D.N.J. Mar. 17, 2017). "Rule 26(e) creates a duty to supplement, not a right," and Defendants cannot simply choose to supplement if convenient. *Ezaki*, 2019 WL 581544, at *3 (citing *Luke v. Family Care & Urgent Med. Clinics,* 323 F. App'x 496, 500 (9th Cir. 2009)). One of Mr. Staller's two conclusions is that "Dr. Csaszar made a total of eight job search efforts between March 15, 2022 and October 17, 2022…or 0.27 efforts per week." Staller Report at 4. Upon finding out that that conclusion was incorrect, Defendants should have immediately supplemented the report (or requested to do so), instead of waiting two months to make the request in an opposition brief.[6]

Moreover, even if Mr. Staller had supplemented his report in a timely fashion, that supplementation would not cure the deficiencies described above. The supplemented report would include a higher number of job search efforts and efforts per week for Dr. Csaszar. However, without any discussion of what a reasonably diligent job search should entail, the report still does not assist the jury in evaluating whether Dr. Csaszar exercised reasonable diligence in his job search. Additionally, the supplementation would have no impact on the unhelpful conclusion that "additional employment opportunities for Dr. Csaszar existed and continue to exist." Staller Report at 4.

IV. **CONCLUSION**

---

[6] Although the time between Dr. Csaszar's deposition and the deadline for summary judgment and *Daubert* motions was not overly long, it would have taken very little time for Defendants to at least put Plaintiff on notice that they intended to supplement their report.

For the foregoing reasons, Plaintiff's Motion is **GRANTED**, and Defendants' expert report is **STRICKEN**.

**BY THE COURT:**

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**